## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DION MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| SEAN MEANS, MARTIN D'ANGELO, | ) | |
| DET. CARMINE DISBROW, JERSEY | ) | |
| CITY, MIKE GELCIAN | ) | |
| (SUPERVISOR), CAPTAIN VINCENT | ) | |
| DOHERTY (SUPERVISOR), SGT. | ) | **JURY TRIAL DEMANDED** |
| CHARLIE RUSSO, HUDSON | ) | |
| COUNTY. | ) | |
| | | |
| Defendants. | | |

## COMPLAINT

Plaintiff, DION MILLER, by his undersigned attorneys, complain of Defendants, JERSEY CITY, SEAN MEANS, DET. CARMINE DISBROW, MARTIN DI'ANGELO, MIKE GELCIAN, CAPTAIN VINCENT DOHERTY, SGT. CHARLIE RUSSO, in their individual capacities, HUDSON COUNTY, THE HUDSON COUNTY PROSECUTOR'S OFFICE, as follows:

### Introduction

1.      Plaintiff Dion Miller spent more than 20 years incarcerated for the robbery and murder of Romeo Cavero – crimes he did not commit.

2.      Every wrongful conviction is tragic, but Mr. Miller's is particularly heartbreaking.

3.      At the time of his arrest, Mr. Miller was just 35 years old.

4.      Through Defendants' misconduct, Mr. Miller lost the next two decades of his life.

5.      The State's manufactured case against Mr. Miller hinged entire on fabricated false evidence.

6.      Included among that fabricated evidence was an involuntary false confession attributed to Mr. Miller, which was concocted, manufactured, and coerced through 17 hours of illegal interrogation.

7.      During this interrogation, Defendants Means and Di'Angelo– at the behest of other Defendants - used intimidation and manipulation to obtain a false and involuntary confession from Mr. Miller.

8.      Prior to and during the interrogation, Defendants Means and Di'Angelo learned that Mr. Miller had a low I.Q., was exhausted, and severely intoxicated.

9.      Defendants were aware of Mr. Miller's vulnerabilities at the time of the interrogation.

10.      Even still, Defendants plowed forward to manufacture a false and involuntary confession from Mr. Miller through illegal and coercive interrogation techniques.

11.      While manufacturing Mr. Miller's false confession, no Defendant took any steps to accommodate Mr. Miller's disability.

12.     Instead, Defendants psychologically coerced a mentally disabled Mr. Miller through 17 hours of intensive interrogation that resulted in a false confession.

13.     Mr. Miller's "confession" has always been demonstrably false.

14.     Ample evidence demonstrates the falsity and unreliability of the manufactured statement.

15.     Mr. Miller's wrongful conviction nearly cost him everything.

16.     With a disability, Mr. Miller was thrown into a maximum-security prison that was incapable of protecting him and providing him with the proper mental health and medical care that he needed to function and survive.

17.     Mr. Miller's wrongful conviction was caused by Defendants' egregious wrongdoing where they manufactured and fabricated all the evidence of his supposed guilt.

18.     Fortunately for Mr. Miller, Defendants' misconduct has since unraveled.

19.     A reinvestigation conducted by the Conviction Review Unit ("CRU") of the New Jersey Attorney General's Office exonerated Mr. Miller.

20.     That reinvestigation concluded that the case against Mr. Miller was nothing more than an illusion all along and that his wrongful conviction was obtained through police coercion, the withholding of critical exculpatory evidence, and the fabrication of false evidence.

21.    Specifically, the CRU found that "the only evidence tying Mr. Miller to the commission of this crime were three false confessions elicited by members of the Jersey City Police Department and the Hudson County Prosecutor's Office during that 17 hour period."

22.    The CRU determined that Defendants committed egregious misconduct resulting in a "miscarriage of justice," Mr. Miller's wrongful conviction.

23.    On July 27, 2023, Mr. Miller was granted a new trial.

24.    That day, Mr. Miller walked out of prison a free man having served nearly half his life behind bars for a crime he did not commit.

25.    This lawsuit seeks to bring the injustice that happened to Mr. Miller to light so that it will never occur again.

## Jurisdiction

26.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.  Mr. Miller also asserts claims under the Rehabilitation Act of 1973 and Title II of Americans with Disabilities Act.

27.    This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to U.S.C. § 1367.

28.    Venue is proper under 28 U.S.C. § 1391(b).  The majority of Defendants reside in this district and the events and omissions giving rise to Plaintiff's claims occurred in this district.

## Parties

29.    Plaintiff Dion Miller is a 55-year-old resident of Jersey City, New Jersey.

30.    At all times relevant hereto, Defendants Sean Means, Carmine Disbrow, Martin Di'Angelo, Mike Gelcian, Charlie Russo (hereinafter "Defendant Officers"), were police officers in the Jersey City Police Department.  All are sued in their individual capacities and acted under color of law and within the scope of their employment during the investigation at issue.

31.    Defendant Jersey City is a municipal corporation under the laws of the State of New Jersey.  The Jersey City is liable for all torts committed by the Defendant Officers while employed by Jersey City pursuant to the doctrine of *respondeat superior*.  Defendant Jersey City is additionally responsible for the official policies of the Jersey City Police Department.  Jersey City is or was the employer of each of the Defendant Officers.

32.    Vincent Dougherty served as a Captain for the Hudson County Prosecutor's Office at the time of the investigation.  He is sued in his individual capacity and acted under color of law and within the scope of his employment during the investigation at issue. At the time of their involvement, Defendants' employment would fall under the purview of the Hudson County Prosecutor's Office and/or Hudson County.

33.    Defendant Hudson County is a governmental agency within the State of New Jersey.  Hudson County is liable for all torts committed by Defendants while employed by the County of Hudson pursuant to the doctrine of *respondeat superior*.

34.    At all times relevant to this action, each of the named individual Defendants acted individually and/or collectively, under the color of the laws, regulations, and customs of the State of New Jersey.  Each Defendant's actions constituted "state action" as defined under federal law.

## The Crime

35.    At approximately 8:00 p.m. on January 5, 2003, Romeo Cavero was attacked and robbed near his residence in Jersey City.

36.    Mr. Cavero was robbed and struck on the head multiple times by his attacker.

37.    The attack did not immediately kill Mr. Cavero, who was able to return back to his apartment and call members of his family.

38.    Mr. Miller had nothing to do with this crime.

## Dion Miller Arrives At His Grandmother's Residence 30-45 Minutes After Mr. Cavero's Attack

39.    At the time of the attack, Mr. Miller was visiting his mother several miles away.

40.    Mr. Miller arrived at his grandmother's residence around 8:30 p.m. to 8:45 p.m. on the night of the attack.

41.    As he arrived to his grandmother's building, Mr. Miller observed blood on the ground.

6

42.     Worried that his grandmother may be injured, Mr. Miller followed the blood trail into the building and was relieved to discover that she was okay.

43.     Still concerned about the condition of the person who's blood was on the ground, Mr. Miller traced the trail of blood to Mr. Cavero's door.

44.     Mr. Miller then knocked on Mr. Cavero's door.

45.     Mr. Miller and Mr. Cavero had a friendly relationship with one another.

46.     After Mr. Cavero opened the door, Mr. Miller observed that he was injured.

47.     Mr. Miller asked Mr. Cavero how he was injured and if he needed medical assistance.

48.     Mr. Cavero also informed Mr. Miller that a black male in a black car had attacked him in the head.

49.     Given the seriousness of his injuries, Mr. Miller tried to help Mr. Cavero as best he could.

50.     Concerned, Mr. Miller even called 911 for assistance.

**Mr. Cavero's Family Arrives on Scene**

51.     Mr. Miller even remained outside Mr. Cavero's apartment until his family arrived.

52.     Mr. Miller informed Mr. Cavero's grandson, Eric Santiago, how he came to discover Mr. Cavero's injuries.

53.     Mr. Cavero was conscious and coherent at the time his family arrived.

54.    Mr. Cavero informed relative Jerry Cavero that he did not know the identity of his attacker.

55.    Specifically, when asked whether he knew the individual who attacked him, Mr. Cavero stated that "it's a black car, parked over, double parked outside, and a black man jetted out and then.  Whatever it is, start beating him and took his money."

56.    At the time of the attack, Mr. Cavero knew Mr. Miller.

57.    When Mr. Cavero informed his relatives that he did not know the identity of the attacker, that would have necessary excluded Mr. Miller from committing the crime.

### Law-Enforcement Arrive on Scene

58.    Jersey City Officer Carmine Disbrow was one of the first responding officers on scene.

59.    Officer Disbrow interviewed Mr. Cavero.

60.    In that interview, Mr. Cavero provided a descrition of the attacker to Officer Disbrow that did not fit Mr. Miller.

61.    Specifically, Mr. Cavero stated that the attacker was a medium build black male – who he did not know – that exited a small black car.

62.    Mr. Cavero further revealed that the attacker approached him and struck him in the head several times with an unknown object before stealing $180 from his pocket and fleeing the scene.

63.     Mr. Cavero's description could never have ever implicated Mr. Miller as: (1) Mr. Cavero did not know the attacker (but knew Mr. Miller); (2) Mr. Miller was not a medium build; and (3) Mr. Miller did not have access to a small black vehicle.

**Mr. Cavero's Condition Deteoriates At Hospital Prior to Death**

64.     After being interviewed, Mr. Cavero was transported to Jersey City Medical Center where his condition detoriated.

65.     Detective Peter Urbanowicz tried to interview Mr. Cavero at the hospital.

66.     Again, Mr. Cavero explained that he did not know the identity of his attacker, but that he might be able to identify the perpetrator in a photospread.

67.     Detective Urbanowicz informed Mr. Cavero's family members to call upon his release to view a photographic lineup.

68.     Mr. Cavero died on January 9, 2003.

69.     Up until the day he died, Mr. Cavero maintained that he did not know the identity of his attacker.

**Not a Shred of Legitimate Evidence Ever Implicated Mr. Miller**

70.     Prior to his interrogation, not a single piece of legitimate evidence implicated Dion Miller in the Cavero attack.

71.     Prior to his interrogation, not a single witness implicated Dion Miller in the Cavero attack.

**Defendants Were Aware of Mr. Miller's Mental Disability, Vulnerabilities,
and Intoxication But Refused to Take Steps To Accommodate**

72.    Defendants then set out to interrogate Mr. Miller.

73.    By 2003, Mr. Miller was a qualified individual with a disability under
the Americans with Disability Act ("ADA").  By the time of his interrogation, Mr.
Miller had a mental disability.

74.    On January 6, 2003, Mr. Miller was taken to the Jersey City Police
Department for custodial questioning.

75.    Prior to the interrogation, Defendants did not have probable cause to
charge Mr. Miller with any crime.

76.    Defendants were aware of Mr. Miller's disability during the
interrogation.

77.    Defendants were aware that Mr. Miller was also incapacited by
intoxication during the interrogation.

78.    Even still Defendants took no steps to accommodate Mr. Miller's
disabilities prior to nor during the interrogation.

79.    Mr. Miller was not permitted to have a lawyer, counselor, or family
member present for his interrogations.

80.    Due to the lack of accommodations made, which could have included a
lawyer, counselor, social worker, or family member, a disabled and intoxicated Mr.
Miller was unable to effectively participate in the specific police activity in an
appropriate manner consistent with his disability.  Such an accommodation would
have allowed for Mr. Miller to have the benefit of providing specific information

10

responsive to Defendants' questioning.

81.     Due to the lack of accommodations made, Defendants were able to psychologically coerce a disabled and intoxicated Mr. Miller into providing a false confession.

82.     Defendants also failed to give Mr. Miller any effective *Miranda* warning.  No steps were taken to assure that Mr. Miller ever understood the *Miranda* warning that Defendants provided to him.

83.     Mr. Miller never knowingly or voluntarily waived his right to remain silent or his right to have counsel present at the interrogation.

### Defendants Means and D'Angelo Psychologically Coerced Mr. Miller Into a False Confession

84.     Defendants' interrogation of Mr. Miller, which took place over the course of 17 hours, was an extreme and alarming abuse of police power.  It was a wholly illegal effort to secure a false confession from Mr. Miller in violation of his constitutional rights by means of psychological coercion.

85.     Over the course of 17 hours, Defendants Means and D'Angelo coerced Mr. Miller into a false confession.

86.     The interrogation began shortly after Mr. Miller arrived at the Jersey City Police Department on January 5, 2003 and continued over a period of 17 hours.

87.     The interrogation was so long that Defendant Means fell asleep at some point during it.

88.     Defendants Means and D'Angelo knew before the interrogation began that Mr. Miller had intellectual deficits and that he had a history of mental health problems that would render him especially vulnerable to coercive techniques.

89.     Defendants Means and D'Angelo knew before the interrogation began that Mr. Miller was severely intoxicated and that would render him especially vulnerable to coercive techniques.

90.     Defendants had ample opportunity to observe the severe symptoms and consequences of these psychological problems throughout the course of the interrogation.

91.     During the interrogation, Defendants observed that Mr. Miller had great trouble understanding and comprehending what was taking place.

92.     Defendants took no steps to limit or adapt their questioning of Mr. Miller in response to his known vulnerabilities.  Instead, the opposite occurred: Defendants agreed among themselves and acted to exploit Mr. Miller's intellectual and emotional weaknesses to secure a confession regardless of whether it was true or false.

93.     Defendants Means and D'Angelo accomplished this task by conducting physically and psychologically abusive interrogation techniques on Mr. Miller.

94.     Defendants Means and D'Angelo repeatedly and strenuously accused Mr. Miller of the murder over the course of the interrogation, despite Mr. Miller's consistent denials of any involvement in the crime.

95.    During the unrecorded interrogations, Defendants Means and D'Angelo, repeatedly fed intimate details of the crime to Mr. Miller.

96.    During the unrecorded interrogations, Defendants Means and D'Angelo repeatedly threatened Mr. Miller.

97.    In the face of extreme psychological abuse and coercion, Mr. Miller steadfastly maintained his innocence.  Mr. Miller told Defendants over and over that he was innocent and had no connection to the murder.  Defendants brushed away evidence corroborating Mr. Miller's claims of innocence.

98.    After hours of interrogation, Defendants' misconduct finally broke Mr. Miller.

99.    By that time, Defendants recognized that Mr. Miller's statement was unreliable and was so factually inaccurate that it could never be used to connect Plaintiff to the murder.

100.    Defendants were aware that the facts of the statement diverged from and contradicted the evidence gathered during their investigation of the murder. Defendants were also aware that any facts consistent with the murder were fed to Mr. Miller through the interrogation.

101.    In performing this analysis of the first statement, Defendants concluded that it could not legitimately support any charge of criminal conduct against Mr. Miller.

102.    Prior to the time that Mr. Miller repeated either of the false confessions, the Defendants knew that there was no legitimate evidence connecting him to the homicide.

103.    In addition, Defendants knew of strong evidence that provided an alibi for Mr. Miller.  Knowing that they lacked probable cause to charge Mr. Miller with the crime, Defendants decided to manufacture another statement for Mr. Miller.

104.    Defendants used the same psychologically coercive techniques during the the remaindure of the 17-hour interrogation session.

105.    Defendants never had probable cause to suspect that Mr. Miller was involved in the crime.  The manufactured and entirely false statements, which Defendants scripted was only (poorly) parroted by Mr. Miller after hours and hours of psychological abuse and uninterrupted interrogation.

106.    Mr. Miller's coerced and false confession was the only evidence connecting him to the murder and was insufficient to establish probable cause.

107.     Without these false and coerced confessions there was nothing to support a criminal proceeding against Mr. Miller.  In the absence of the misconduct described above, Mr. Miller would not have stood trial and never would have been convicted of the murder.

108.    Defendants' investigation confirmed the falsity and unreliability of Mr. Miller's false confessions.  Defendants learned that Mr. Miller's false confessions were not only inconsistent with one another, but they were likewise inconsistent with the physical evidence developed during the underlying criminal investigation.

109.    Defendants knew that Mr. Miller's false confessions did not amount to probable cause.

## DEFENDANT DOUGHERTY JOINS CONSPIRACY TO FRAME PLAINTIFF

110.    At the time of the underlying misconduct, Defendant Vincent Dougherty was a Captain with the Hudson County Prosecutor's Office.

111.    Prior to the formation – and fabrication – of probable cause, Defendant Dougherty was informed that Defendants coerced, fabricated, and manufactured a false confession for Plaintiff.

112.    Sgt. William ("Bill") Heaney, who then worked for the Hudson County Prosecutor's Office, and was present for Plaintiff's interrogation and involved in the underlying investigation, was outraged as he witnessed the violation of Plaintiff's constitutional rights and took significant steps to try to stop it.

113.    As part of those efforts, Sgt. Heaney informed Defendant Captain Dougherty of the serious and egregious misconduct committed by the Defendants that violated Plaintiff's consitutitonal rights.

114.    Defendant Dougherty was informed that the Defendants coerced a false confession from Plaintiff.

115.    Defendant Dougherty was informed as to how Plaintiff's false confession was manufactured, coerced, and fabricated.

116.    Defendant Dougherty was informed that there was no probable cause to initiate charges aginst Plaintiff.

117.    Defendant Dougherty was informed that there was no credible evidence implicating Plaintiff in the crime.

118.    Defendant Dougherty was later informed that there was credible evidence implicating alternate suspects.

119.    Instead of taking steps to stop Defendants violation of Plaintiff's constitutional rights – and the wrongful prosecution/conviction of an innocent man – Defendant Dougherty joined Defendants' conspiracy to frame Plaintiff.

120.    He did so by enabling and encouraging the fabrication of false evidence, withholding of exculpatory evidence, the initiation of charges without probable cause, and through retaliation against Sgt. Heaney.

121.    For example, when Sgt. Heaney sought to develop additional evidence implicating alternate suspects, Defendant Dougherty told him that if he continues to investigate this matter, he will be "[explitive] fired."

122.    Defendant Dougherty then took additional steps to threaten and harass Sgt. Heaney into not developing evidence implicating the true perpetrators.

123.    Defendants subsequently learned of exculpatory evidence implicating two other individuals (who had approximately 10 felony convictions) in robberies and violent attacks mirroring what happened to the victim in this case.

124.    Instead of disclosing this exculpatory evidence – and ending Plaintiff's wrongful prosecutions – Defendants took steps to further conceal such evidence.

125.    As Captain, Defendant Doughtery joined Defendants' efforts to conceal exculpatory evidence, conceal the fabrication of false evidence, and retaliation

16

against Sgt. Heaney were part of Defendants' larger scheme to secure Plaintiff's wrongful conviction and violate his constitutional rights.

### Mr. Miller's Tragic Wrongful Conviction

126.    Mr. Miller first stood trial in June 2005.  Mr. Miller's initial trial resulted in a hung jury.

127.    At the  2006 retrial, the false, coerced, and fabricated case Defendants' manufactured resulted in Mr. Miller's wrongful conviction.

128.    Because the evidence against Mr. Miller was false, fabricated, and coerced, there was never probable cause to charge him with the robbery and murder of Mr. Cavero.

129.    Without Defendants' misconduct, Mr. Miller would not have been prosecuted or convicted.

130.    At trial, the jury was with the false confessions manufactured for Mr. Miller after 17 hours of psychologically coercive interrogation sessions that exploited his disabilities.

131.    The jury was not provided with the unrecorded interrogation sessions where psychological coercion was used to manufacture and fabricate the false confessions Mr. Miller later repeated during the recorded statements.

132.    At the same time, the Defendants withheld the egregious misconduct that occurred during the psychologically coercive interrogation that resulted in Mr. Miller's false confessions.  Defendants likewise withheld that Mr. Miller was fed the information throughout the interrogation sessions and did not volunteer it himself.

133.    With this, Mr. Miller was wrongfully convicted of murder and sentenced to 30 years in prison.

### Mr. Miller is Exonerated in 2023

134.    Never giving up hope and remaining steadfast in his protestation of innocence, Mr. Miller challenged his wrongful conviction during his years of incarceration.

135.    The CRU reinvestigation determined that Mr. Miller was innocent and that his false confessions were a product of egregious misconduct.

136.    Based on his actual innocence, the CRU ultimately petitioned the Court for Mr. Miller's convictions to be reversed.

137.    On July 27, 2023, Mr. Miller was granted a new trial and the charges were dismissed.

138.    On that date, Mr. Miller was finally exonerated from crimes he did not commit.

### Hudson County and Jersey City Failed to Provide Sufficient Training and Supervision to Avoid Brady Violations and Has Exhibited Deliberate Indifference as to Whether or Not Brady Violations Will Continue to Occur

139.    The constitutional injuries Mr. Miller suffered were caused by the policies and practices of the Jersey City Police Department and Hudson County Prosecutor's Office.

140.    Indeed, within the Jersey City Police Department and Hudson County Prosecutor's Office, there was a policy and practice of taking shortcuts to close criminal investigations, including by fabricating statements, coercing witnesses

and/or suspects during interrogations, and withholding exculpatory and impeachment evidence.

141.    Policymakers and supervisory personnel were aware of and failed to curb the improper investigative practices that led to the numerous *Brady* violations in this case.

142.    The problems that Defendants had as investigators, many of which were on full display during the investigation, were common knowledge at the Jersey City Police Department and Hudson County Prosecutor's Office.

143.    This policy and practice repeated itself in numerous criminal investigations conducted by Defendants at the Jersey City Police Department and Hudson County Prosecutor's Office.

144.    Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.  Defendants still remained as law-enforcement officers within the Department, their misconduct remained undisclosed to criminal defendants like Mr. Miller, and they was permitted to act with impunity in criminal investigations.

145.    Jersey City and and Hudson County Prosecutor's Office officials within the Departments failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.

146.    They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

147.    The policies and practices described in the foregoing paragraphs were consciously approved by Jersey City and and Hudson County Prosecutor's Office policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

148.    Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

149.    Moreover, Defendants failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.

150.    Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the Defendants practices and *de facto* policies, as alleged above.

## Mr. Miller's Damages

151.    Mr. Miller was incarcerated for 20 years for a crime that he did not commit.

152.    During his wrongful incarceration, Mr. Miller was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to raise his child, share holidays, births, funerals and other life events with

20

loved ones, and the fundamental freedom to live one's life as an autonomous human being.

153.   Plaintiff suffered serious physical, mental, and emoational injuries throughout his wrongful incarceration.  Plaintiff also suffered the tragic loss of innumerable family and friends during his wrongful incarceration.  None more problematic than his mother's death in 2004, where he was only afforded a bedside visit prior to her death.  At the funeral home, instead of being allowed to humanely grieve his mother's loss, he was surrounded by a correctional officer, instead of his loving family.

154.   Mr. Miller also suffered physical injuries during his incarceration. Those injuries included the lack of adequate medical and mental-health care for Mr. Miller, a person with serious disabilities.  Those struggles caused Mr. Miller to suffer immensely, on a daily basis, and impacted his ability to function on a daily basis.  For example, a hand infection originating from rust on his prison bed during incarceration almost cost Plaintiff the amputation of his arm in 2019.  By then, Plaintiff's hand was infected so badly that it resulted in a serious surjury.

155.   As a result of his wrongful incarcerations, Mr. Miller must now attempt to rebuild his life all without the benefit of two decades of life experience that ordinarily equip adults for that task.

156.   Mr. Miller has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

## Count I - 42 U.S.C. § 1983
## Due Process: All Defendants

157.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

158.   As described more fully above, the Jersey City Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Miller of his constitutional right to a fair trial.

159.   In the manner described more fully above, the Jersey City Defendants conducted a reckless investigation, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false testimony, and other evidence.  Absent this misconduct, the prosecution of Mr. Miller could not and would not have been pursued.

160.   The Jersey City Defendants misconduct also directly resulted in the unjust criminal conviction of Mr. Miller, thereby denying each of his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

161.   As a result of this violation of his constitutional right to a fair trial, Mr. Miller suffered injuries including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

162.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Miller's constitutional rights.

163.    The misconduct described in this Count was undertaken pursuant to routine practice of the Jersey City Department to pursue wrongful convictions through reckless and profoundly flawed investigations, provision of false evidence and reports, coerced evidence, and failure to properly supervise employees knowing that those employees were providing false evidence.  In this way, the municipal defendants violated Mr. Miller's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

164.    These widespread practices, so well-settled as to constitute *de facto* policy in the Jersey City Police Department, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to these problems, thereby effectively ratifying them.

165.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II
### Coercive Interrogation: Fifth and Fourteenth Amendments
### Defendants Means and D'Angelo

166.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

167.    The actions of Defendants Means and D'Angelo, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and of using psychological interrogation techniques which "shock the conscience" during said interrogations, resulted in the false, coerced, and fabricated confession that was subsequently used

against him at trial, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law as guaranteed by the United States Constitution.

168.    The actions of Defendants Means and D'Angelo in using coercive techniques to interrogate Plaintiff, and/or, in encouraging, condoning and permitting the use of said techniques, and/or failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

169.    Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

170.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

171.    The misconduct described in this Count by the Jersey City Defendants was undertaken pursuant to the policy and practice of the Jersey City Police Department.

### Count III – 42 U.S.C. § 1983
### Deprivation of Liberty Without Probable Cause
### Fourth and Fourteenth Amendments: All Defendants

172.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

173.    As described more fully above, the Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Miller of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

174.    In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Miller for these crimes, for which prosecution there was no probable cause and which caused Mr. Miller to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory evidence.

175.    The Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Mr. Miller, thereby denying each of his constitutional right to liberty in violation of his constitutional rights.

176.    As described more fully above, the prosecution was ultimately resolved in Mr. Miller's favor.

177.    Because of this violation of his constitutional rights, Mr. Miller suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

178.    The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Miller's constitutional rights.

179.    The misconduct described in this Count was undertaken pursuant to a routine practice of the Jersey City Police Department to pursue wrongful

prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence. In this way, the municipal defendants violated Mr. Miller's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

180.    These widespread practices, so well-settled so as to constitute *de facto* policy in the Jersey City Police Department, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

181.    The widespread practices described in the preceding paragraphs could flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count IV – 42 U.S.C. § 1983
## Supervisory Liability: Defendants Gelcian, Dougherty, Russo

182.    Each paragraph of this Complaint is incorporated as if restated fully herein.

183.    The continued wrongful detention of Mr. Miller was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendants Gelcian, Doherty, and Russo when they failed to adequately train and supervise the individual Defendants.

184.    Specifically, the supervisory defendants were personally involved in the case against Mr. Miller and knew or, in the absence of their deliberate indifference and recklessness, should have known of his subordinates' unconstitutional actions and related misconduct in the case.

26

185.    Furthermore, the supervisory Defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those concerning the interviews of witnesses, the preparation of forensic reports and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other Defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Miller.

186.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the Defendant supervisors failed to train and supervise his subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Miller's constitutional rights.

187.    The personal involvement of the Defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Miller, including the above-mentioned injuries and damages.

188.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Miller's clearly established constitutional rights.

**Count V - 42 U.S.C. § 1983**
**Failure to Intervene: All Defendants**

189.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

190.    In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

191.    Because of the Defendants failure to intervene to prevent the violation of Mr. Miller's constitutional rights, Mr. Miller suffered pain and injury, as well as emotional distress.

192.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Miller's rights.

193.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Jersey City Police Department in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

### Count VI - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights: All Defendants

194.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

195.    After Cavero was killed, the Defendants reached an agreement amongst themselves to frame Mr. Miller for the crime and to thereby deprive him of

his constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

196.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

197.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

198.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Miller's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

199.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

200.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Jersey City Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

### Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Jersey City

201.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

202.    The actions of the Jersey City Police Officers in withholding material exculpatory information from Mr. Miller and his counsel were undertaken pursuant to the policies and practices of the Jersey City Police, described above, which were created, maintained, or ratified by policymakers for the Jersey City with final policymaking authority.

203.    The policies and practices described in this Count were maintained and implemented by the Jersey City with deliberate indifference to Mr. Miller's constitutional rights.

204.    As a direct and proximate result of the Jersey City's actions, Mr. Miller's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

205.    Jersey City is therefore liable for the misconduct committed by its officers.

### COUNT VIII: Americans with Disabilities Act
### Against Jersey City and Hudson County

206.    Each paragraph of this complaint is incorporated as if fully restated here.

207.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

208.    Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

209.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

210.    Jersey City is a public entity as defined in 42 U.S.C. § 12131(1).

211.    At all times relevant to this Complaint, in light of his severe mental disability, Mr. Miller was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

212.    Due to his severe disability, Mr. Miller had a mental impairment that substantially limited one or more major life activities, including but not limited to thinking, interacting with others, and controlling his behavior.  As a result of his mental disabilities, Mr. Miller required accommodations to effectively participate in the specific policy activity in an appropriate manner consistent with his disability: to provide the police with accurate information concerning the Cavero homicide investigation.

213.    In the interrogation, Mr. Miller was wholly dependent upon Defendants to provide appropriate accommodations.  As someone with a disability, Mr. Miller met the essential eligibility requirement for receipt of services or the participation in programs or activities provided by Jersey City.

214.    Under the Title II of the ADA and 28 C.F.R. § 35.130(a), Defendant Jersey City is responsible for ensuring that individuals in a custodial interrogation (like Mr. Miller was) with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability.

215.    Despite Mr. Miller's known and obvious disability—Defendants failed to reasonably accommodate Mr. Miller's disability by failing to provide him with access to accommodations like the presence of counsel, social-worker, medical treater, or a family member.

216.    The foregoing accommodations were reasonable and would have enhanced Mr. Miller's ability to provide the police accurate information regarding police activities, while also alleviating his suffering.  Instead, and precisely because of his disability, Defendants did not provide Mr. Miller with the necessary accommodations.

217.    Due to the failure of Defendants to provide Mr. Miller with the reasonable accommodations, which could have included a lawyer, counselor, social worker, or family member, a disabled Mr. Miller was unable to effectively participate in the specific policy activity in an appropriate manner consistent with his disability.  Such an accommodation would have allowed for Mr. Miller to have the benefit of providing specific information responsive to Defendants' questioning.

218.    Due to the lack of accommodations made, Defendants were able to psychologically coerce a disabled Mr. Miller into providing a false confession.

219.    As a result of the Defendants' failure to provide reasonable

accommodations for and their discrimination against Mr. Miller's disability, Mr. Miller suffered extreme mental pain, anguish, physical harm, was wrongfully convicted, and further experienced 20 years of wrongful incarceration, as described in this complaint.

## COUNT IX: Rehabilitation Act of 1973
## Against Jersey City and Hudson County

220.    Each paragraph of this complaint is incorporated as if fully restated here.

221.    At all times relevant to this Complaint, in light of his severe mental disability, Mr. Miller was a qualified individual with a disability as defined in Section 504 of the Rehabilitation Act of 1973.

222.    Due to his disability, Mr. Miller had a mental impairment that substantially limited one or more major life activity, including but not limited to thinking, interacting with others, and controlling his behavior.

223.    Defendant Jersey City receives federal financial assistance.

224.    Defendants discriminated against Mr. Miller by failing to provide a reasonable accommodation for his mental disabilities.

225.    By not providing Mr. Miller with accommodations in the interrogation, which could have included a lawyer, counselor, social worker, or family member, a disabled Mr. Miller was unable to effectively participate in the specific policy activity in an appropriate manner consistent with his disability.  Such an accommodation would have allowed for Mr. Miller to have the benefit of providing specific information responsive to Defendants' questioning.  By failing to do so, the

Defendants discriminated against Mr. Miller on the basis of his disability in violation of the Rehabilitation Act.

226.    Due to the lack of accommodations made, Defendants were able to psychologically coerce a disabled Mr. Miller into providing a false confession.

227.    As a result of the Defendants' failure to provide reasonable accommodation for his mental disability, Mr. Miller suffered extreme mental pain, anguish, physical harm, was wrongfully convicted, and further experienced nearly 20 years of wrongful incarceration, as described in this complaint.

## STATE LAW CLAIMS

### Count X
### Respondeat Superior: Defendants Jersey City and Hudson County

228.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

229.    In committing the acts alleged in the preceding paragraphs, the Police Defendants were members and agents of the Jersey City Police Department and Hudson County acting at all relevant times within the scope of their employment. Defendants Jersey City and Hudson County are liable as principals for all state law torts committed by their agents.

### COUNT XI
### Intentional Infliction of Emotional Distress: All Defendants

230.    Mr. Miller hereby incorporate by reference the foregoing paragraphs and further allege as follows.

231.    Defendants intentionally and/or recklessly, directly and proximately caused Mr. Miller, innocent men, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Miller to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, e) maliciously prosecuting, f) exploiting his disability, and g) psychologically coercing his false confession, causing Mr. Miller's false arrest and imprisonment.

232.    The Defendants' actions caused Mr. Miller to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

The Defendants' actions caused Mr. Miller to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

**WHEREFORE**, Plaintiff DION MILLER, respectfully requests that this Court enter judgment in his favor and against **all Defendants**, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

### JURY DEMAND

Plaintiff, DION MILLER, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**ANDREOZZI + FOOTE**

Dated: February 5, 2025          _s/ Nathaniel L. Foote, Esq._
4503 North Front Street
Harrisburg, PA 17110
Ph: 717.525.9124 | Fax: 717.525.9143
nate@vca.law; tina@vca.law; veronica@vca.law

**LOEVY & LOEVY**

Elliot Slosar, Esq. (_Pro Hac Vice_ Pending)
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
Ph: 312-243-5900
elliot@loevy.com

_Attorneys for Plaintiff_